The next case today is Arch Insurance v. The Graphic Builders LLC, appeal number 21-1126. Attorney Brianski, please introduce yourself for the record and proceed with your argument. And please the court, Richard Brianski on behalf of The Graphic Builders. The Graphic Builders is not seeking to complete, not seeking its $2.8 million it spent to do complete repair work. And it's not seeking through this appeal, the $1.9 million in delay damages. Nor is The Graphic Builders requesting that Arch pay for or complete any work. Rather, the sole and only issue identified in this appeal is to enforce Arch's post-completion guarantee of its obligation to issue a window warranty. There is no dispute that Arch's principal, RCM, has failed to issue a window warranty. Nor is there any dispute... Which warranty are we talking about? The RCM's warranty or the manufacturer's warranty? To me, they're one and the same, but RCM was obligated to issue the manufacturer's warranty for the windows. That's what's at issue here. Okay, so when the windows are sold, normally the manufacturer will stand behind them with a warranty unless he objects to the way that they were installed or used or the like. Yeah, that's accurate. And what I think is significant about the way you frame the issue is that the warranty is issued post-completion, meaning after the windows are installed and all the work is completed. And the problem here was your client is alleged to have installed the windows improperly, thus defeating the warranty, allowing the manufacturer to say it's not giving a warranty. Not my client. I'm sorry, the contractor. Here, RCM, who is the principal on the bond that Arch guaranteed, didn't comply with their obligations. And for whatever reason, I think it's sort of irrelevant to our argument why the window warranty wasn't issued. What is relevant is that it wasn't issued and Arch agreed jointly and severally to guarantee that obligation. But if it's a workmanship issue, it would be very relevant if the manufacturer didn't think that their product was installed properly. I'm having a hard time understanding why Arch would be required if the manufacturer isn't required. We don't have a contractual relationship with the manufacturer. The contractual relationship is between Arch and its principal, RCM. We retained RCM, and one of RCM's obligations was to produce a manufacturer's window warranty under the terms of its contract. Arch agreed to guarantee that performance. So in the event its principal has failed to produce that manufacturer's warranty, Arch, by issuing that performance bond with the explicit language, agreed to step into its shoes and figure out how to produce that window warranty. Counsel, what I think is the key statement in the district court's decision, it says that your client, and this is why Arch has no obligation to provide the warranty that you seek, that your client unilaterally arranged for third-party subcontractors to remediate RCM's work. In other words, Arch was never given an opportunity to respond to the deficiencies in the work by RCM. Your client took it upon itself for whatever reason to solve the problem without involving the surety in those remediation efforts at all. So given that history, why should Arch now be asked to provide a warranty when it had no opportunity to decide how it should solve the problem? I don't know how you overcome that inescapable fact about how this whole dispute played out. Well, one, I think that's factually inaccurate and slightly inconsistent with the judge's decision. If you look, he specifically, Judge Gordon specifically found that there were two letters that were issued both to the principal and to the surety on or about October 2018. At that time, there was a request and a demand for the window warranty. And what's significant here, your honor, is that this is a modular manufacturer. So they had basically completed and installed all of these windows at the time that we had issued this request and demand and notice. There was not a formal termination, but there doesn't have to be in this case, and it serves no purpose because all of the work was essentially completed. So Arch had the opportunity and the notice. And to a certain extent, you know, those windows were already done. Essentially, it had to be redone. I mean, you know, when you say it's essentially completed, it sounds like wordplay. I mean, it had to be, I don't know the specifics, but it had to be done. It wasn't it wasn't done. It wasn't done properly. Well, that is right. That is absolutely correct. But RCM is the principal is the one who actually did the work. Could you just address Judge Lopez's question about the lack of involvement at Arch in the remediation as the contract required? Well, no, Arch had notice. Five minutes, counsel. Arch absolutely had notice and the graphic builders provided it notice. And that's something that Judge Gordon found. There was a lot of notice, a lot of letters. Sorry, I couldn't hear you. The problem isn't lack of notice. The problem is under the bond, the surety's obligations aren't triggered until the obligee terminates the insured party. So they have an opportunity to come in and fix the windows themselves. That's absolutely correct. The way those conditions precedent are identified. But what I think the error here was applying those particular conditions to a post-completion warranty. We couldn't terminate RCM after they substantially completed the work. And that's why I think it's so significant the way you frame the issue. Because a warranty by its very nature doesn't become issued until after the work is completed. And what I still haven't heard from the judge nor Arch is assuming that my factual circumstance is correct, which you'd have to on summary judgment, that RCM completed its work or at least substantially completed its work so much so that we could not legally terminate. How do we trigger this warranty obligation, which only occurs post-completion? Let me ask you this. Let me ask you this. Suppose the modules were all delivered and there were no windows in them. Right? It was such a bad installation, they all fell out before they left the factory. I think what you would do is you would have a breach by RCM. You would terminate them. The surety would then come in and the surety would decide, have various options on what to do. And if it fixed the windows and put them in properly, then a warranty might ensue or it might buy a warranty or the like. Why is this case different? The windows were in, but they were not providing, they weren't properly installed. Why isn't that a breach that triggers the same analysis I just went through? I guess the flip side of that is why can't TGB allow RCM, the graphic bill, allow RCM to remediate its own work, which is exactly what happens in just about every circumstance. In fact, it's what the surety would want to happen. Because the contract says that ARCH has a right to be involved in the remediation to perhaps select a different sub to complete the work or to make other arrangements with your client. That's only assuming there's a material breach. We allowed, and there's nothing inherently wrong with what we did. In fact, it's consistent with the terms of the bond. We allowed RCM to complete its work. We were under the impression, and part of completing the work was issuing the Then there was the obligation to produce the warranty, which never happened. When that happened, all the work was done. There's no basis to terminate. That's the reconciliation that the judge doesn't really gather, and the ARCH doesn't really explain. If the work is completed like it typically would be in a warranty circumstance, and there's no legal basis to terminate the contract, but the warranty is something that ARCH will agree is covered under the terms of the bond. How do I get the benefit of my bargain? How can I terminate that contract? Let me ask you a factual question. Are you saying that RCM completed the work, the modular units are up, the windows are there, and it's only after what you would say is completion that you then discover there are problems with the way in which the windows were installed? Is that sequentially? Is that what happened here? It's not even that there were problems. RCM remediated the problems. The issue was that the manufacturer didn't issue the warranty. You had to go out, if I understand what happened here, you had to go out and get somebody else at a cost of almost two million dollars to correct the problem with the windows. Isn't that what happened? No, there was a bunch of other answers. Because there was water infiltration, we had to fix a bunch of other issues. Council, that's time. May I finish? Yeah, because we still don't understand the sequence of what happened here. Can I respond to that? Yes, and could you respond to what the nature of the remediation was? Did you have to install new windows? I mean, what happened here? No, RCM with the manufacturer went through and completed what we thought were going to be sufficient repairs for the warranty to issue. Ultimately, the manufacturer decided not to issue the warranty. The manufacturer was on notice. ARCH was on notice. RCM was working with the manufacturer and the owners collectively. Exactly what you'd like to see on a construction project in an effort to complete. The windows were leaking and they came up with a repair. The repair was agreed upon. It was only after we learned that the manufacturer wasn't going to produce the warranty. Did you ask ARCH to be involved in all of these discussions that you're describing in an attempt to solve the problem? Were they part of that effort? ARCH was, there's a series of letters even identified by Judge Gordon throughout, I think two in October, one in January, and a few thereafter, all of which putting ARCH on notice. I don't think that's really in dispute. I think the issue, the sole issue as it's framed is that we didn't terminate the contract because we didn't terminate RCM's contract. There was no framing because they've taken out all the other issues. This is solely a warranty issue, which only happens post-completion. We couldn't terminate it. Judge Gordon or ARCH really explains how we, the beneficiary of the bond, assuming that I'm right, because you'd have to go on summary judgment, that these issues occurred post-completion, terminate a contract, or what the purpose of that would be. You're saying when someone delivers modules with defective windows that require several million dollars to fix, that's not a material breach of the contract? It was a material breach of the contract. At that point, didn't you then have a decision to make? Terminate the breaching subcontractor and have the surety step in, or go with the subcontractor rather than having the surety stepped in, and you went with the latter? That's correct, except at the end, we didn't waive any of the obligations under the contract, and there wasn't the discovery of this warranty issue until after the majority of the work was completed, where there is no basis to terminate. Did you sue the manufacturer? We can't sue the manufacturer. There's no privity. Well, your sub could have sued the manufacturer and collected the warranty, but the whole reason that ARCH is there is to jointly and severally guarantee this obligation, and ARCH is not going to say they're not obligated to produce the warranty. They're going to say we didn't terminate the contractor, and there's no case that I'm aware of that deals with sort of these post-completion rights. Even though there's an acknowledgment that those obligations exist, how is an obligee to trigger those rights if termination isn't an option? All right, Mr. Brianski, thank you. Thank you. Attorney Brianski, please mute your audio and video. Attorney Burwood, please unmute your audio and video and proceed with your argument. Good morning. May it please the court, my name is Jonathan Burwood, and I represent the Appellee ARCH Insurance Company. The appellant makes one primary argument, that Section 3.2 of the performance bond is not a condition precedent, and the appellant makes that argument in two ways, both of which are unavailing. First, the appellant argues that only Section 1 of the bond controls at the expense of the other 15 sections, including the conditions precedent established in Section 3. And second, if the court finds that argument unavailing, the appellant argues that they were either not required to, or they could not terminate the bonded subcontract as required by Section 3.2. As to the first argument, Your Honors, there's no conflict or competition between Section 1 and Section 3 of the bond. They're complementary. As crafted by the American Institute of Architects, Section 1 sets the obligation, that obligation is performance of the construction contract. Section 3, among others, sets the conditions precedent to performing that obligation. And in that regard, the bond obligee, TGB in this case, must satisfy Section 3.2 before the surety has any obligation to perform the construction contract. The plain language of Section 3 in the bond provides the surety's obligation under this bond shall arise after the enumerated sections 3.1, 3.2, and 3.3 are satisfied. And it is not disputed. Excuse me, counsel. I take it from the appellant's argument, at least in part, that, and I gather there's no dispute looking at Part 1 of Section 3, that TGB did provide notice to RCM and the surety that TGB is considering declaring a contract of default. When you're applying, I wonder if you want to speak more generally, when a surety gets a notice like that, what obligations, if any, does that trigger on the part of the surety to respond to the notice of default? What happens in the wake of such a notice? Thank you, Judge Lopez. It is undisputed that TGB did, in fact, satisfy Section 3.1 of the bond. And as set forth in our brief, that's significant because it shows that they read the bond, they understood they had certain conditions, precedent obligations, and they started to satisfy those obligations. They sent several notices to the surety. Interestingly, many of them said, well, we're considering declaring a contract of default, but we are not terminating the contract and we are not making a claim on the bond. The interpretation of which from our standpoint was they wanted the surety to be either at the ready or on notice, but they did not want the surety to act. And that was borne out in the 30B6 deposition of their corporate rep, who testified they chose not to terminate. They did not want to bring the surety in for commercial reasons. They feared losing control of the timing and cost of completing the project. But in terms of your question of what obligation does that set, in Section... There is a requirement under 3.1 to have a meeting. The Arch did participate in a meeting with the obligee and the bond principal, and that meeting is designed essentially to discuss whether or not there can be a cure. Can they resolve any of the default that's happening prior to advancing to Section 3.2, which is a more significant condition, which is termination of the contract. That meeting happened. The surety attended the meeting. And as I mentioned, the correspondence from the obligee was we are not yet terminating the contract. We are not yet making a claim on the bond. And so the surety went back to monitoring. But because RCM, the principal, was still in privity with TGB, and there was no claim on the bond, there was no further performance obligation by the surety in that regard, Your Honor. Let me ask you a hypothetical to see if I can focus in. Suppose RCM performed everything, did all good work, everything proper. The modules were installed. People were moving into them. But then the manufacturer refused to supply the manufacturer's warranty. And RCM therefore did not provide that warranty to the contractor or the owner. How would that play out under the bond? Could TCB then at that point terminate the subcontractor? Yes, Your Honor. So under those circumstances, first of all, the subcontractor provided that TGB had very expansive rights relative to termination. They were not restricted. And they could terminate essentially for any violation of the subcontract at no prejudice to any further remedy. And so they had that right. So you're saying even under that not the cause of the warranty, even under that hypothetical, TGB would need to make the decision whether trying to work it out on its own with RCM or terminate RCM and put it in your client's lap? Yeah, and that's significant, Your Honor, for a couple reasons. First of all, the warranty obligation is not insignificant. The TGB in this case when they first sued the surety indicated it was a $2 million obligation. So I'd offer to the court that RCM's failure to provide a $2 million bond would be a material breach of the contract and they could terminate. And in that circumstance, Your Honor, under that hypothetical, it is certainly likely that the surety would have had a performance obligation. And that obligation would have been to go out and get a bond. Unfortunately, that's not what happened here. Here in 2018, TGB started to self-perform. They did $2.8 million worth of work. And in the process, any opportunity the surety might have had to engage with the manufacturer of the windows went by the wayside. And that's why the conditions precedent in the H.R.E. 12 bond provide what they do, which is that at the time there's a default, you must terminate the principal and you must make a claim on the bond because time is of the essence. The surety is able to come in, they stand in the principal's shoes, so they would have stood in RCM's shoes, they would have had privity with respect to the window manufacturer, and they would have had leverage to somehow mitigate the damages, bring in somebody to repair the damages, and with respect to the warranty, the surety could have directly engaged the manufacturer to get that warranty. TGB denied ARCH that opportunity in 2018 by, they reached a fork in the road, they decided not to make a bond claim, they decided to unilaterally self-perform. And in doing so, they discharged the surety for the reasons I just said. After that one meeting that ARCH attended, did they attend any other meetings between the manufacturer and the owner? Your Honor, I don't believe there were meetings between the manufacturer and the owner. The meeting that took place was between the owner or the contractor in this case, which is TGB, the bond principal subcontractor, RCM, and the surety, and it was to try to resolve the default that TGB had declared relative to RCM. Were there any other meetings between those three parties other than the one you've described? No, Your Honor, that's the only meeting that the bond contemplates, and it's the only meeting that TGB invited ARCH to attend. Was there any written communication that involved ARCH? There's certainly ample written communication, and what TGB consciously did here was they sent letters to both RCM and the surety saying they were unhappy with the work, they were remediating, that they were looking for some sort of relief, but in those letters, they failed to make a claim on the bond. And in two particular letters, Your Honor, they specifically said, we've declared RCM a default, but we have not terminated, we are not making a claim on the bond, sending the very clear message to the surety that no performance is expected or required. And through discovery, Your Honor, the record indicates that the 30B6 designee of TGB testified that they consciously chose not to terminate because they did not want the surety to get involved, and the witness characterized that as making a claim on the surety bond would be the equivalent of shooting themselves in the face. They were concerned about losing control of the project and having the surety being able to exercise some level of control and completion. Counselor, just in terms of sequence, I get the impression that ARCH was first confronted with a demand from TGB for this warranty with respect to the window installation after all of the remediation work had been done for $2.8 million, whatever the figure is, is that correct? Is that when your client first confronted the demand for a warranty from TGB? Is that correct? Your Honor, it is not. In 2018, one of the demand letters, one of the initial demand letters issued by TGB mentioned the lack of and the need for a warranty. I apologize, I just don't have the citation at my fingertips, but it is included in the record appendix. But as I and ARCH understand the record, that warranty claim was raised at the latest in 2018 and before the $2.8 million of work was performed unilaterally by TGB. And your client, in the absence of the termination of the contract, took the position that there was no basis for providing that warranty? Is that correct? Yeah, ARCH took the position that there was no obligation to perform, A, because the conditions precedent had not been satisfied, there was no termination, and B, because TGB directly told them in writing, we do not want you to perform, there is no claim on the bond. And that happened, you know, long after the initial correspondence started. Counsel, that's time. Your Honor, may I finish? Yes, please. The District Court, Your Honor, viewed the record that TGB satisfied Section 3.1 condition precedent, stopped short of terminating under Section 3.2, and never effectively triggered any performance obligation under the bond. And I'll offer you that this argument now on appeal for the first time, that it's strictly about the warranty, that's the appellant crafting a lifeboat for the warranty claim. The performance claim is clearly not valid under the bond, and this reframing of the warranty claim as somehow not being a completion obligation, Your Honor, ARCH rejects, and we'd ask the Court to affirm the District Court's decision below. Just one other question, what was the overall cost of this project? Your Honor, the subcontract, initial subcontract, was $8.6 million. So that was the modular component of the contract, was $8.6 million. The overall cost of the project, Your Honor, would be substantially north of that. I just don't have that type of thing at my fingertips. What I'm trying to get at is, I assume that their argument about substantial performance has to do with the work in fact was substantially performed, and it would have been inappropriate, and in fact a breach of the contract for them to have terminated when substantial performance had already taken place. Well, I think there are two things that undermine that claim. First is, they went ahead and they performed $2.8 million worth of remedial work on an $8.6 million subcontract. So I'd offer to the Court that that's not substantial performance. Perhaps RCM had thought they performed, but TGB went ahead and spent almost $3 million for remedial work. The second thing I'd offer, Your Honor, is that the record is clear. There was no claim in the correspondence that TGB could not terminate. The record is clear that TGB consciously chose not to terminate, and they did so for commercial reasons. So the argument now on appeal that they could not terminate is a brand new argument, and it's not supported by the record, and in fact it's contradicted by the record, whereas their 3B6 designee testified that they consciously chose not to terminate the contract, not that they were somehow restricted from doing so. But did they make that argument below to the District Court that substantial performance prevented them from terminating? I believe they did, Your Honor. Okay. Are there any other questions, colleagues? No. No, thank you. Okay. Thank you, Mr. Burwood. Thank you, counsel. That concludes argument in this case. Attorney Brianski and Attorney Burwood, you should disconnect from the hearing at this time.